UNITED STATES of America, Plaintiff–Appellee,

v.

Melvin A. FISHER, Kane Fisher, Salvors, Inc., a Florida Corporation, in personam, M/V BOOKMAKER, M/V TROPICAL MAGIC, their engines, apparel, tackle, appurtenances, stores and cargo, in rem, Defendants–Appellants,

M/V DAUNTLESS, Defendant.

No. 92–4799.

United States Court of Appeals, Eleventh Circuit.

June 3, 1994.

---

David P. Horan, Key West, FL, for defendants-appellants.

Barbara K. Bisno, Asst. U.S. Atty., Miami, FL, and Bradley M. Campbell, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for plaintiff-appellee.

Before HATCHETT and EDMONDSON, Circuit Judges, and FRIEDMAN *, Senior Circuit Judge.

FRIEDMAN, Senior Circuit Judge:

This is an appeal from an order of the United States District Court for the Southern District of Florida preliminarily enjoining the appellants from violating the Marine Protection, Research, and Sanctuaries Act ("Sanctuaries Act"), 16 U.S.C. §§ 1431–45, and the Florida Keys National Marine Sanctuary and Protection Act ("Florida Keys Act"), Pub.L. No. 101–605, 104 Stat. 3089 (1990), by conducting certain marine salvage operations. We hold that the district court did not abuse its discretion in granting the preliminary injunction and therefore affirm.

* Honorable Daniel M. Friedman, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

I

A. The Statutory Scheme

Congress enacted the Sanctuaries Act in response to a "growing concern about the increasing degradation of marine habitats." S.Rep. No. 595, 100th Cong., 2d Sess. 1 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4387. The Sanctuaries Act

provides for the protection of important and sensitive marine areas and resources of national significance through the establishment of marine sanctuaries. The purpose of these sanctuaries is to preserve or restore such areas for their conservation, recreational, ecological, or aesthetic value.

*Id.; see also* 16 U.S.C. § 1431.

The statement of the "Purposes and policies" of the Act includes:

(2) to provide authority for comprehensive and coordinated conservation and management of these marine areas that will complement existing regulatory authorities;

(5) to facilitate, to the extent compatible with the primary objective of resource protection, all public and private uses of the resources of these marine areas not prohibited pursuant to other authorities.

16 U.S.C. § 1431(b).

The Sanctuaries Act gives the Secretary of Commerce ("Secretary") the authority to designate and manage marine sanctuaries and to specify in such designation the regulatory requirements for the particular sanctuary. 16 U.S.C. § 1433. The Secretary has delegated these responsibilities to the Department's National Oceanic and Atmospheric Administration ("Administration"). S.Rep. No. 595, 1988 U.S.C.C.A.N. at 4387–88.

The statute defines "sanctuary resource" broadly to mean

any living or nonliving resource of a national marine sanctuary that contributes to the conservation, recreational, ecological, historical, research, educational, or aesthetic value of the sanctuary.

16 U.S.C. § 1432(8).

The Act specifies the procedures the Secretary must follow in designating a marine sanctuary. In "proposing to designate a national marine sanctuary," the Secretary must provide a management plan, an environmental impact statement, and other documents to accompany the notice of proposed designation. 16 U.S.C. § 1434(a)(1). The documentation is first provided in draft form for public comment by publication in the Federal Register and to the appropriate committees of both Houses of Congress. *Id.* Final documentation is published in the Federal Register and provided to Congress. 16 U.S.C. § 1434(b). The sanctuary designation "takes effect" forty-five days after the Secretary issues the final "notice of designation." The forty-five day period allows Congress the opportunity to disapprove "any of [the designation's] terms." *Id.*

The Secretary is authorized to "conduct such enforcement activities as are necessary and reasonable to carry out this [Sanctuaries Act]." 16 U.S.C. § 1437(a). Under 16 U.S.C. § 1443(a)(1),

[a]ny person who destroys, causes the loss of, or injures any sanctuary resource is liable to the United States for response costs and damages resulting from the destruction, loss, or injury.

The statute also provides for judicial equitable relief:

If the Secretary determines that there is an imminent risk of destruction or loss of or injury to a sanctuary resource, or that there has been actual destruction or loss of, or injury to, a sanctuary resource which may give rise to liability under section 1443 of this title, the Attorney General, upon request of the Secretary, shall seek to obtain such relief as may be necessary to abate such risk or actual destruction, loss or injury, or to restore or replace the sanctuary resource, or both. The district courts of the United States shall have jurisdiction in such a case to order such relief as the public interest and the equities of the case may require.

16 U.S.C. § 1437(i).

In addition to the designation of marine sanctuaries by the Secretary, Congress itself has designated sanctuaries. In the Florida Keys Act, Congress "designated as the Florida Keys National Marine Sanctuary under title III of the [Sanctuaries Act] [the area

involved in this case]. The Sanctuary shall be managed and regulations enforced under all applicable provisions of such title III as if the Sanctuary had been designated under such title." Florida Keys Act § 5(a). The stated "purpose of this Act is to protect the resources of the [Florida Keys National Marine Sanctuary]." *Id.* § 3(b). Among the Congressional findings in the Act are that "spectacular, unique, and nationally significant marine environments, including seagrass meadows" are located adjacent to the "Florida Keys land mass" (*id.* § 2(2)) and that "[t]hese marine environments are subject to damage and loss of their ecological integrity from a variety of sources of disturbance." *Id.* § 2(5).

The Florida Keys Act requires a number of planning activities, coupled with public participation requirements, which parallel those in the Sanctuaries Act. For example, the Administration is directed to develop a comprehensive management plan for the sanctuary within 30 months to "facilitate all public and private uses of the Sanctuary consistent with the primary objective of Sanctuary protection." *Id.* § 7(a)(1). The Environmental Protection Agency is directed to prepare a comprehensive water quality protection program for the sanctuary. *Id.* § 8(a). The Administration is required to establish an intergovernmental advisory council to assist in the development and implementation of the management plan for the sanctuary. *Id.* § 9(a).

Both the Sanctuaries Act and the Florida Keys Act were later amended by the Oceans Act of 1992, which became effective after the injunction in this case. Pub.L. No. 102–587, 106 Stat. 5039 (1992). Among other provisions, the Oceans Act strengthens the liability and enforcement provisions of the Florida Keys Act; provides additional authority and resources to the Environmental Protection Agency to conduct monitoring programs in the sanctuary; and designates three additional national marine sanctuaries. *Id.*

### B. The Present Case

The appellants are maritime salvors. This case arises out of their conduct of salvaging operations involving the use of devices known as "prop wash deflectors," in an area known as Coffins Patch, which the Fishers stipulated "is entirely within the boundaries of the [Florida Keys Sanctuary]."

Prop wash deflectors, also known as "mailboxes," are used to direct propeller wash to remove seabed sediments and expose underlying materials. The Fishers stipulated that they used those deflectors in Coffins Patch "to remove overburden, sediments, and seagrass in which artifacts are contained," and had removed historic artifacts from Coffins Patch. The Fishers also stipulated that, while using prop wash deflectors in Coffins Patch, they had "created at least 100 depressions" in the seabed.

The United States filed a complaint against the appellants (the two Fishers, a corporation they own and control that "specializes in marine salvage and treasure hunting" [collectively, the Fishers] and three vessels used in their salvage operations). It sought damages and injunctive relief "arising out of defendants willfully destroying, causing the loss of, and injuring sanctuary resources, many of which are irreplaceable" in the Florida Keys sanctuary through their use of prop wash deflectors. It also sought forfeiture of the three vessels. The United States also sought a preliminary injunction to restrain the Fishers "from further dredging or salvage activities within the Florida Keys National Marine Sanctuary until trial or other disposition of the merits of this action." The Fishers cross-moved for an injunction to restrain the government from interfering with their activities.

The district court referred the motions to a magistrate judge. Extensive expert and other testimony describing the injury the Fishers' prop wash deflectors had inflicted on the sanctuary was introduced at a hearing before the magistrate judge.

The government presented expert testimony that the sanctuary had been irreparably injured. The testimony described the damage done to the seagrass and the coral reef ecosystem. The experts explained that the seagrasses were required to stabilize the sea bottom and preserve water quality. The testimony included a damage survey of at least

27 craters in Coffins Patch that were more than 30 feet across and more than 80 feet deep. The lack of algal growth established that these were recent excavations. The length of the grass blades and the rhizome system indicated that prop wash deflectors had been used. The experts also described the damage to fans, sponges, and historic artifacts unearthed by prop wash deflectors.

The experts described the destructive effects of prop wash deflector use, which included the following: (1) the sites would not reestablish themselves; (2) the displaced sediment buried seagrass to lethal depths; (3) the craters led to continuing erosion and destruction of the seagrass ledge; and (4) the absence of substrate and fill for craters precluded revegetation. These experts confirmed that the damage had been recent.

Eyewitnesses testified that all three of the Fishers' vessels in Coffins Patch were using prop wash deflectors. One eyewitness testified that several times a week he saw only the Fishers using those deflectors in the area of damage.

Some of the Fisher's own evidence was consistent with the government's. For example, one witness for the Fishers acknowledged the destructive potential of prop wash deflectors. Kane Fisher confirmed that only the Fishers had been using prop wash deflectors in Coffins Patch during the time when the damage was done to the sanctuary.

The magistrate judge filed a report recommending that the government's motion for a preliminary injunction be granted. The magistrate judge first held that the government was "substantially likely to prevail on its § 1443 claim against the defendants." He ruled that "[t]o prevail on its § 1443 claim, the government must show simply that the defendants have injured sanctuary resources." He stated that it was "undisputed" that the Fishers used prop wash deflectors in the sanctuary, that such use created at least 100 depressions in the area and that

> persuasive testimony by Dr. Joseph Zieman indicates that these depressions have injured and disrupted vital seagrass environments in the Sanctuary. (Transcript at 84–92.) This seagrass, anchored on the ocean's bottom, is an integral part of the

coral reef ecosystem and serves as shelter, food, and habitat for myriad life forms present in the Sanctuary. Dr. Zieman testified that "regrowth of that grass is probably not going to occur within our life times." (*Id.* at 90.) (footnote omitted.)

The magistrate judge held that "the injured seagrass environments are clearly 'sanctuary resources' under the MPRSA. 16 U.S.C. § 1432(8). The Sanctuary Act expressly refers to the protection of 'seagrass meadows.' Sanctuary Act, §§ 2(2), 2(3). There is little dispute that seagrass beds contribute to conservation, recreational, ecological, research, educational, and aesthetic values, as intended by the Sanctuary Act. *Id.*" The magistrate judge rejected the Fishers' argument that under the Sanctuaries Act and the Florida Keys Act, the Florida Keys Sanctuaries had not yet been established and that the prohibitions of the Sanctuaries Act therefore were not operative there.

The magistrate judge held that irreparable injury would result if the Fishers' activities were not preliminarily enjoined and that a preliminary injunction would serve the public interest. The magistrate judge concluded, however, that "[t]he injunction sought by the government, barring the defendants from all salvage activities in the Sanctuary, is overbroad and unsupported by the evidence." Since the "government has only shown damage to the Sanctuary from the defendants' use of prop wash deflectors ... an injunction barring the defendants from employing prop wash deflectors would be sufficient to ensure that the Sanctuary is not further damaged. This injunction should not bar the defendants from pursuing their livelihood by using other salvage techniques in the Sanctuary area."

The district court, "[b]ased upon the Magistrate's recommendation, and after independent review of the record," issued a preliminary injunction against the Fishers, and denied their motion.

## II

A "preliminary injunction will be reversed only if the trial court clearly abused its discretion." *GSW, Inc. v. Long County, Geor-*

*gia,* 999 F.2d 1508, 1518 (11th Cir.1993). To obtain a preliminary injunction, the government must prove: (1) that it has a substantial likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that the injury to the government from denial of injunctive relief outweighs the damage to the other party if it is granted; and (4) that the injunction will not harm the public interest. *GSW, Inc.,* 999 F.2d at 1518.

The Fishers make no attempt to show that in granting a preliminary injunction, the district court misapplied these four factors. They argue only that the statutory provisions involved are not operative in the Florida Keys Sanctuary, and that, in any event, those provisions cannot be applied to them. Indeed, their briefs read like an appeal from a final judgment, not from a preliminary injunction.

These arguments presumably are directed to the magistrate judge's ruling on the first of the four relevant factors—that the government is substantially likely to prevail on the merits. The argument apparently is that since the statute does not apply to the Fishers' conduct, not only is the government not likely to prevail on the merits, but that it cannot possibly do so. As the Fishers have structured their argument, they have waived any challenge to the magistrate judge's ruling on the three other factors. Accordingly, we shall address only the merits of the government's positions.

■ A. The Fishers' principal contention is that the Florida Keys Sanctuary will not become an existing entity until the Secretary has promulgated a management plan for that sanctuary, which he has not done, and that the statutory provisions they are charged with violating are inoperative in the sanctuary and, therefore, cannot be applied to them.

The Fishers rely on § 1434(b) of the Sanctuaries Act, which provides that the Secretary's designation of a marine sanctuary "takes effect" 45 days after the Secretary has issued his final "notice of designation." They point out that the Florida Keys Act requires the Administration to promulgate a management plan for the Florida Keys Sanctuary

within 30 months, and argue that the Congressional designation of the sanctuary, like the Secretary's designation of other sanctuaries, does not "take effect" until the management plan for it has been promulgated.

Unlike § 1434(b) of the Sanctuaries Act, however, there is nothing in the Florida Keys Act that states that Congressional designation of the Florida Keys Sanctuary does not "take effect" until the Administration has promulgated a management plan for that sanctuary. To the contrary, the language of the Florida Keys Act indicates that the Congressional designation of that sanctuary was effective on the effective date of the Act.

The caption of the Florida Keys Act describes it as an Act "[t]o establish" the Florida Keys National Marine Sanctuary. The Congressional findings include the statement that "[a]ction is necessary to provide comprehensive protection for these marine environments by establishing a Florida Keys National Marine Sanctuary ..." Florida Keys Act § 2(7). Section 5(a) of the Act, captioned "DESIGNATION," provides that the described area "is designated as the Florida Keys National Marine Sanctuary ... [and] shall be managed and regulations enforced under all applicable provisions [of the Sanctuaries Act] as if the Sanctuary had been designated under such title." Florida Keys Act § 5(a).

These provisions show that the Florida Keys Act itself established the Florida Keys Sanctuary and did not require any further action by the Administration for the sanctuary to come into existence. "It is well established that, absent a clear direction by Congress to the contrary, a law takes effect on the date of its enactment." *Gozlon–Peretz v. United States,* 498 U.S. 395, 404, 111 S.Ct. 840, 846, 112 L.Ed.2d 919 (1991). Here, as in *Gozlon–Peretz,* "[w]e find no such contrary directions in the language of [the statute] or in its evident purpose." *Id.*

There is a sound practical reason why, in the Florida Keys Act, Congress designated the Florida Keys Sanctuary effective immediately and did not delay the effectiveness of the designation for a stated period, as it did in sanctuaries designated by the Secretary

under the Sanctuaries Act. In the latter situation, the 45–day delay of the taking effect of the Secretary's designation was designed to give Congress the opportunity to disapprove "any of [the designations] terms," (16 U.S.C. § 1434(b)) and the public the opportunity to make its views known. Where, however, Congress itself made the designation, there was no need or occasion for such delay. The public already has had the opportunity to comment upon the legislation while it was pending before Congress, and Congress fully considered the terms of the designation before the Act was enacted.

Although the Florida Keys Act requires the Secretary to develop, with public participation, a management plan for the Florida Keys Sanctuary, there was no reason for Congress itself to review that plan after the statute became effective, and no indication that Congress reserved that right. Indeed, in view of the Congressional concern over effectively protecting the Florida Keys Sanctuary that led Congress in the Florida Keys Act itself to create the sanctuary, it is difficult to believe that Congress would have delayed implementation of the sanctuary for the 30 months the Secretary had to promulgate a management plan. This 30–month period stands in sharp contrast to the 45 days that Congress has to review and possibly disapprove the Secretary's designation of a sanctuary under the Sanctuaries Act.

In the Florida Keys Act, Congress did not merely itself designate, in place of a "notice of designation" by the Secretary, a particular sanctuary. Instead, it provided that the sanctuary "is designated" and should be treated as if it "had been designated" under the Sanctuaries Act. Florida Keys Act § 5. Congress thus adopted a different procedure than it had provided for sanctuary designations by the Secretary.

The President so recognized when he signed the Florida Keys Act. In his accompanying statement, the President noted that Congress was "bypassing" the "usual process" of "designating after adherence to the comprehensive evaluation and designation procedures set forth in the [Sanctuaries Act]." Statement by President George Bush Upon Signing H.R. 5909, 26 Weekly Comp.

Pres.Doc. 1829 (Nov. 19, 1990), *reprinted in* 1990 U.S.C.C.A.N. 4393–2. The President stated that Department of Commerce studies supported the designation, justifying this bypassing by Congress. *Id.* He concluded that this sanctuary designation would "augment" the federal government's efforts to protect the marine resources of the Florida Keys. *Id.*

█ B. The Fishers argue that 18 U.S.C. § 1434(a)(1) precludes the bringing of an enforcement action in the district court until the Secretary has promulgated a management plan for the sanctuary that includes enforcement activity. That section provides that "[i]n proposing to designate a national marine sanctuary, the Secretary," on the same day that the notice of the proposal is published in the Federal Register, shall submit to two specified House and Senate committees "a prospectus on the proposal which shall contain," among other things, the "draft management plan detailing ... enforcement, including surveillance activities for the area." Relying on the statement in the Florida Keys Act that the Florida Keys Sanctuary "shall be managed and regulations enforced under all applicable provisions" of the Sanctuaries Act "as if the Sanctuary had been designated under" that Act (Florida Keys Act, § 5(a)), the Fishers contend that the Secretary is required to submit a prospectus to Congress specifying his proposed enforcement actions for the Florida Keys Sanctuary before the government may maintain district court enforcement action.

The reference in § 1434(a)(1) to "enforcement, including surveillance activity in the area" refers to a marine sanctuary that the Secretary has proposed to designate, not to one that Congress itself has designated. The words "in the area" refer back to the previous section, which deals with designation of sanctuaries by the Secretary. Moreover, the "enforcement ... activities" appear to be those administrative actions that the Secretary himself plans to conduct in the sanctuary he proposes to designate, pursuant to his authority under 16 U.S.C. § 1437(a), which states that "[t]he Secretary shall conduct such enforcement activities as are necessary and reasonable to carry out this chapter."

Nothing in these provisions requires that, before the government may file an enforcement action in the district court the Secretary must submit to Congress a prospectus specifying his enforcement plan. To the contrary, 16 U.S.C. § 1437(i) provides that, if the Secretary determines that there "is an imminent risk of destruction or loss of or injury to a sanctuary resource, or that there has been actual destruction or loss of, or injury to, a sanctuary resource which may give rise to liability under section 1443 of this title," the Attorney General, on request of the Secretary, shall seek in a district court relief "necessary to abate such risk or actual destruction, loss, or injury, or to restore or replace the sanctuary resource, or both."

The only requirements for the bringing of such an action thus are (1) the Secretary's determination of an imminent risk of destruction or loss of, or injury to, a sanctuary resource and (2) a request by the Secretary to the Attorney General to bring an enforcement action. Nothing in this section, pursuant to which the United States filed the present suit, even suggests, let alone requires, that prior thereto the Secretary must have informed Congress about his enforcement plans for the sanctuary.

C. The Fishers contend that before the United States may file an enforcement suit, the Secretary must have filed an environmental impact statement. They rely on 16 U.S.C. § 1434(a)(2), which requires the Secretary, in connection with a proposed designation of "a national marine sanctuary," to "prepare a draft environmental impact statement, as provided by the National Environmental Policy Act of 1969 (42 U.S.C. 4321 *et seq.*), on the proposal that includes ... maps depicting the boundaries of the proposed designated area...."

This provision, however, like other previously discussed provisions of the Sanctuaries Act upon which the Fishers rely, relates to a sanctuary designated by the Secretary, not to one designated by Congress. There is no requirement in the statute that before the Congressional establishment of a sanctuary becomes effective, the Secretary must first prepare an environmental impact statement for that sanctuary. If Congress had intend-

ed to impose that requirement for sanctuaries that it designated, presumably it would have said so explicitly—as it did with respect to sanctuaries that the Secretary designates.

The Fishers rely on the statement in the House Report on the Florida Keys Act that "the Committee expects that the Secretary will ... prepare an environmental impact statement" for the Florida Keys Sanctuary. (H.R.Rep. No. 593, 101st Cong. 2d Sess., pt. 1 at 9 (1990)). That comment, however, merely stated the Committee's expectation that the Secretary would prepare a statement. It did not provide that, until that statement had been prepared, the Congressional designation of the sanctuary would not be effective.

D. In holding that the government is substantially likely to prevail on the merits of its claim that the Fishers violated 16 U.S.C. § 1443, the magistrate judge noted that under that section, which makes liable to the United States "any person who destroys, causes the loss of, or injures any sanctuary resource," the government "must show simply that the defendants have injured sanctuary resources." He pointed out that in light of the stipulation, it was "undisputed" that the Fishers used prop wash deflectors in the Florida Keys Sanctuary and that such use created at least 100 openings in the seabed there. The magistrate judge stated that expert testimony indicated that "these depressions have injured and disrupted vital seagrass elements" there and he held that "the injured seagrass environments are clearly 'sanctuary resources' under the [Sanctuaries Act] 16 U.S.C. § 1432(8)." These facts and conclusions, which the Fishers do not here challenge, support the magistrate judge's conclusion that the government is substantially likely to prevail on the merits.

The district court also properly rejected the Fishers' purported defenses to the charges against them. Section 1434(c) in essence permits conduct in a sanctuary that was authorized by a permit in existence prior to the designation of the sanctuary. The Fishers stipulated, however, that they did not have a permit covering their use of prop wash deflectors in the Florida Keys Sanctu-

ary.   Although the Fishers assert that it would have been futile for them to have sought such a permit because the Administration had not adopted procedures for the issuance of permits and, in fact, was not issuing permits, the Fishers never applied for such a permit.   We decline to speculate whether, if they had so applied, the Administration would have denied their application and, if it had done so, whether, on judicial review, the Fishers could have reversed that denial.

We discern no basis for the Fishers' contention that their history of prior salvage operations constitutes a defense to the violation of the Sanctuaries Act with which they are charged.

E.   Considering all the circumstances, the district court justifiably concluded that the government had shown a substantial likelihood of success on the merits and did not abuse its discretion in granting the limited preliminary injunction, prohibiting only the use of prop wash deflectors.   That injunction is AFFIRMED.