**UNITED STATES of America, Plaintiff,**

v.

**Melvin A. FISHER, Kane Fisher, Salvors, Inc., a Florida corporation, M/V Bookmaker, M/V Dauntless, M/V Tropical Magic, their engines, apparel, tackle, appurtenances, stores, and cargo, in rem, Defendants.**

**MOTIVATION, INC., Plaintiff,**

v.

**UNIDENTIFIED, WRECKED AND ABANDONED SAILING VESSEL, etc., Defendant.**

Nos. 92–10027–CIV, 95–10051–CIV.

United States District Court, S.D. Florida, Key West Division.

July 30, 1997.

James A. Lofton, Jon A. Mueller, U.S. Dept. of Justice, Environmental Enforcement Section, Washington, DC, Caroline M. Zander, U.S. Dept. of Justice, Gen. Litigation Section, Washington, DC, Lisa B. Hogan, Asst. U.S. Atty., Southern Dist. of Florida, Miami, FL, for Plaintiff.

William Vandercreek, Dallas, TX, for Mel Fisher.

Michael R. Barnes, Key West, FL, for Kane Fisher.

Richard G. Rumrell, Jacksonville, FL, for Motivation, Inc., Salvors, Inc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD B. DAVIS, Chief Judge.

This action stems from Defendants' 1992 treasure-hunting activities in the Florida Keys National Marine Sanctuary (the Keys Sanctuary). In Case Number 92–10027–CIV–DAVIS, the United States alleges that the Defendants illegally destroyed seagrass in the Keys Sanctuary and removed artifacts. The government seeks damages and an injunction under the Marine Protection, Research and Sanctuaries Act (the Sanctuaries Act). In 1995, Motivation, Inc.,[1] filed a separate action, seeking title to the same artifacts and a salvage award. *See* Case Number 95–10051–CIV–DAVIS.

On May 9, 1997, the Court dismissed the three vessels, the M/V Dauntless, the M/V Tropical Magic, and the M/V Bookmaker, as Defendants in Case Number 92–10027. The Court then tried this matter without a jury on May 12–13 and 19–21, 1997. At trial, the Court dismissed Melvin A. Fisher as a Defendant in Case Number 92–10027, then dismissed Case Number 95–10051 entirely. Therefore, the only remaining Defendants are Kane Fisher and Salvors, Inc. (collectively referred to below as "the Defendants").

Based on the evidence adduced at trial and pursuant to Federal Rule of Civil Procedure 52(a), the court enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT [2]

#### A. Seagrass Damage

1. From January through March 1992, the M/V Dauntless, the M/V Tropical Magic, and the M/V Bookmaker conducted treasure-hunting operations in Atlantic Ocean waters off Grassy Key, Florida, known as Coffins Patch.

2. Coffins Patch is located within the boundaries of the Keys Sanctuary, a Congressionally-designated National Marine Sanctuary. The Keys Sanctuary is comprised of 2,800 square nautical miles of coral reef, seagrass, mangrove fringe shoreline and hard-bottom habitats that Congress designated for special protection in passing the

---

1. Salvors, Inc., and Motivation, Inc., are related treasure-hunting companies that Defendants Melvin and Kane Fisher operate.

2. To the extent that any Findings of Fact represent legal conclusions, they are adopted as Conclusions of Law.

Florida Keys National Marine Sanctuary Act (the Keys Act) in 1990.

3. Kane Fisher, an employee of Salvors, Inc., was captain of the M/V Dauntless and directed its treasure-hunting activities in Coffins Patch from January through March 1992. Fisher also directed the activities of the M/V Tropical Magic and the M/V Bookmaker during those three months. All three boats were in some capacity working for Salvors, Inc.

4. The three vessels were equipped with prop wash deflectors, also known as mailboxes, while operating in Coffins Patch. The mailboxes assisted in treasure hunting.

5. Mailboxes consist of a pair of large, angular pipes mounted on the transom of a vessel. Once lowered from the transom, one end of each pipe fits directly over each of the vessel's propellers. The pipe turns at a ninety-degree angle and then aims straight down, directing the thrust of the ship's engines towards the sea bottom. The goal is to displace sediment and unearth buried items.

6. Mailboxes are powerful devices that can displace five feet of hard-packed mud in thirty-five feet of water. They also can excavate up to twenty-five feet of sand from the ocean bottom. They can make a hole in sand thirty feet across and three to four feet deep in fifteen seconds.

7. The water in Coffins Patch is very shallow, in many places only fifteen feet deep.

8. Using mailboxes, the Defendants made more than 600 holes in the Coffins Patch sea bottom during the first three months of 1992 while attempting to unearth artifacts. These holes are commonly referred to as blowholes. The mailboxes on the M/V Dauntless made 395 blowholes, and Kane Fisher personally ordered at least 300 of them to be dug.

9. The blowholes averaged twenty to thirty feet in diameter and three to five feet in depth, and extended along a line for more than a mile.

10. Bancroft Thorne is a Marathon dive boat operator who led ninety dive trips to Coffins Patch from 1987 through 1992. Thorne observed the M/V Dauntless, the M/V Tropical Magic, and the M/V Bookmaker using mailboxes in Coffins Patch on several occasions in January, February and March 1992. Neither he nor Kane Fisher saw any other boats salvaging in Coffins Patch during those three months.[3]

11. The three vessels salvaged about 150 yards from where Thorne and his clients were diving. On several occasions, the mailboxes caused a large cloud of silt to wash over Thorne and his clients, reducing visibility to zero and forcing them to move dive locations.

12. On at least one occasion after this happened, and after the three vessels had left, Thorne and other divers swam over to the area where the boats had been working. Thorne saw numerous blowholes that he had not previously seen.

13. Kane Fisher placed spar buoys on the ocean surface to mark the site in Coffins Patch where he had salvaged for treasure. On March 23, 1992, Billy Causey, the Keys Sanctuary Superintendent, dove beneath one of the buoys in response to unconfirmed reports of damage to the ocean bottom. Causey counted nine blowholes on the sea bottom, all containing extensive seagrass damage.

14. Causey returned to the area on March 29, 1992, with video camera. He documented twenty-five blowholes up to nine feet deep. Causey believed the blowholes were made in the middle of seagrass beds because (1) all had dead seagrass in them, and (2) he found long seagrass blades exposed at the edges of the blowholes—the type of blades normally found in the middle of seagrass beds. Causey believed the holes were made during the previous month because rubble in and around them was stark white—the normal color of freshly exposed rubble. There was no algae growth that he would have expected to see on older rubble.

---

**3.** Kane Fisher testified he observed several old blowholes in Coffins Patch when he first began digging there in January 1992, but saw no more than 10 on the first day and less than 100 during the entire time he salvaged there.

15. Harold Hudson, a Keys Sanctuary marine biologist, videotaped blowholes in Coffins Patch on April 4 and May 5–6, 1992. In May, Hudson and nine other divers videotaped seagrass damage in forty-one blowholes. Hudson documented large chunks of seagrass, some up to two feet thick, that had been ripped out and had fallen into the blowholes. He saw rubble and sediment on top of dead seagrass. Hudson believed the damage had occurred in the previous two months because fine sediment had settled on seagrass blades. If the damage had been older, that sediment would have washed off. Hudson described the seagrass damage as massive.

16. On April 25, 1992, Curtis Kruer, an environmental biologist, photographed about twenty-five blowholes in Coffins Patch, some up to six feet deep. Kruer observed haybale-sized chunks of seagrass lying in the blowholes, and up to three feet of sediment on top of dead seagrass.

17. Kruer believed the blowholes had been made no more than two months earlier because (1) sediment was still sitting on seagrass blades and (2) the coral rubble he observed was stark white. In addition, he believed the holes were man-made, rather than caused by tides and currents, because naturally caused craters are much shallower and not as steep as the blowholes he observed in Coffins Patch. There also had been no major storms in the area that would have caused such severe natural erosion. The only similar damage that Kruer had seen was caused by bombs dropped from airplanes onto a bombing test range in waters near Puerto Rico.

18. Dr. Joseph Zieman is an environmental science professor at the University of Virginia who has spent his career studying seagrass. Zieman visited Coffins Patch in May 1992. He observed blowholes up to forty feet wide and ten feet deep, many of which contained an "incredible amount" of dead seagrass. He also saw hay-bale-sized chunks of dead seagrass. In thirty years of working with seagrass, Zieman had never seen such extensive damage.

19. Like other scientists, Zieman thought the holes had been made within the previous two months because the exposed coral rubble was still white. Like Kruer, he believed the holes were man-made, rather than natural, because of their symmetrical shape, depth, and steepness.

20. The March 1993 "Storm of the Century" brought gale force winds to the Florida Keys for thirty-six hours. The storm moved substantial material on the ocean bottom and filled in the Coffins Patch blowholes. Neither of the defense experts who testified at trial, Harold Wanless and Anitra Thorhaug, saw the Coffins Patch blowholes before the storm filled them in.

21. The blowholes that Defendants made damaged at least 1.63 acres of seagrass. This figure is based on Zieman's review of photographs taken of the damaged areas by McIntosh Marine in 1992, and a McIntosh Marine report calculating the damage based on (1) the number of holes and (2) the percentage of sand to seagrass throughout the area. Using the same photos, Zieman independently calculated the damage and came up with the same figure as McIntosh Marine. Zieman did other damage calculations based on different sets of photographs, and concluded that the damage could have been as high as 3.3 acres. However, he concluded that based on the quality of the McIntosh Marine photos, 1.63 acres was an accurate, albeit conservative, damage estimate.

### B. Restoration

22. The Coffins Patch area is swept by high-energy waves that keep bare sand areas in motion. This inhibits or limits seagrass recolonization in the area.

23. Natural recolonization in sandy areas of Coffins Patch is very slow. A full recovery of seagrass in the area where blowholes were made will take between 50 and 100 years.

24. The National Oceanic and Atmospheric Administration (NOAA) conducted a pilot project to determine if it could restore seagrass in the Coffins Patch damage tract by transplanting it. However, none of NOAA's seagrass transplants survived. There have been no successful transplants in

other areas with wave energy similar to that in Coffins Patch.

25. The seagrass Defendants destroyed cannot be restored or replanted in the area of the blowholes.

26. In December 1996, NOAA conducted a survey to identify potential seagrass restoration projects in the Keys Sanctuary that would be similar in scale and nature to the seagrass injuries in Coffins Patch. NOAA determined that the most viable off-site restoration project would be to transplant seagrass into boat-impacted areas which had later become no-motor zones (Prop Scar Restoration Project)

27. NOAA selected boat-impacted areas because they 1) are among natural seagrass beds, 2) represent a human-induced injury, 3) can be found in hydrodynamically protected areas, 4) present large-scale scarring that is not recovering, 5) have been restored in this geographic area and elsewhere, 6) occur in sufficient acreage, and 7) constitute an injury not unlike that found in Coffins Patch.

28. NOAA developed a restoration plan to implement the chosen project. The primary components of this plan include identifying methods of site marking, planting techniques, monitoring, and evaluating success.

29. NOAA determined the appropriate scale of the compensatory seagrass restoration project using an assessment methodology known as the Habitat Equivalency Analysis (HEA). The HEA quantifies the total resource services lost due to an injury. The HEA determines the quantity of equivalent habitat necessary to be restored and/or created, so that total resource services gained through restoration equals total resource services lost due to the injury. "Services" refers to functions that a resource performs for other resources or humans.

30. The HEA is appropriate to determine the scale of compensatory restoration projects when 1) the primary category of lost on-site services pertains to the ecological/biological function of an area; 2) feasible restoration projects are available that provide

services of the same type, quality, and comparable value to those that were lost; and 3) sufficient data on the required HEA input parameters exist and are cost effective to collect.

31. Since these three criteria were met in this case, the HFA is the most technically appropriate and cost-effective method to quantify the natural resource damage.

32. Based on an estimated 1.63 acres of damaged seagrass in Coffins Patch, NOAA calculated the total services lost due to the seagrass injury, the total services provided by the Prop Scar Restoration Project, and the total acreage of compensatory habitat required, so that total resource services gained were equivalent to total resource services lost.

33. An acre-year represents the total level of ecological services provided by one acre of seagrass over a single year. Using the HEA, NOAA calculated that 44.08 acre-years of services were lost due to the injury in Coffins Patch.

34. NOAA also used the HEA to calculate the scale of compensatory habitat necessary to compensate for the 44.08 acre-years of lost seagrass services. NOAA determined that 1.55 acres of seagrass habitat must be restored under the Prop Scar Restoration Project to compensate for the lost seagrass services.

35. NOAA has estimated the cost of implementing the 1.55–acre Prop Scar Restoration Project. The estimate includes the costs necessary to obtain aerial photographs of selected sites, perform on-site "groundtruthing," collect and install seagrass planting units, obtain necessary permits, and monitor the project. The estimate includes expected labor, materials, and travel costs for each of these steps.

36. The total cost of implementing the Prop Scar Restoration Project is $351,648.

37. NOAA has incurred certain costs to respond and assess damage to sanctuary resources in this case. Those costs total $211,-130. As of January 1997, $26,533 in interest had accrued on these costs.[4]

---

4. The parties have stipulated to the amount of response costs, damage assessment costs, and interest.

## C. Artifacts

38. Contextual information is the relationship between artifacts and materials in an archeological site that provides patterns through which archeologists may make inferences about the past.

39. In widely scattered shallow water shipwrecks, a distinction may be drawn between primary cultural deposits, secondary scatter, and tertiary scatter.

40. The primary cultural deposit is the location where the ship itself has sunk to the bottom of the sea. In this area, a homogenous assemblage of artifacts remain closely associated to each other and contextual information is more likely to be found.

41. The secondary scatter of a site has less contextual information. It provides a good indication of where to look for the primary cultural deposit, as well as the rest of the site.

42. The tertiary scatter has even less contextual information to offer. Artifacts are scattered over a wide area. The tertiary site may be miles away from the primary cultural deposit.

43. The Defendants excavated and recovered a number of artifacts from the sea bottom in Coffins Patch in the course of their treasure-hunting activities. These artifacts were recorded on a Conservation Lab Artifact Report.

44. Based on the vessel logs completed during the excavation and recovery, Defendants' activities took place within a tertiary scatter, as Defendants were trying to identify whether a site existed in a particular area of Coffins Patch.

45. Accordingly, the Court concludes that little, if any, contextual information was lost in the course of Defendants' treasure-hunting activities in Coffins Patch.[5]

## CONCLUSIONS OF LAW [6]

### A. The Statutory Scheme

1. Congress enacted the Sanctuaries Act in response to "a growing concern about the increasing degradation of marine habitats." S.Rep. No. 595, 100th Cong., 2d Sess. 1 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4387.

2. The Sanctuaries Act provides for the protection of important and sensitive marine areas through the establishment of marine sanctuaries. The purpose of the sanctuaries is to preserve sensitive areas for their conservation, recreational, ecological, or aesthetic value. *Id.;* 16 U.S.C. § 1431. Under the Act, the Secretary of Commerce may designate and manage marine sanctuaries. 16 U.S.C. § 1433. The Secretary has delegated those responsibilities to NOAA.

3. The Sanctuaries Act imposes strict liability on "any person who destroys, causes the loss of, or injures any sanctuary resource." 16 U.S.C. § 1443; *United States v. M/V. Miss Beholden,* 856 F.Supp. 668, 670 (S.D.Fla.1994). The Secretary of Commerce may seek damages from and injunctions against anyone who destroys or injures sanctuary resources. 16 U.S.C. §§ 1437 and 1443. A person may avoid liability under Section 1443 only if he can show that the damage was (1) caused by an act of God, an act of war, or the act or omission of a third party, (2) caused by an activity authorized by federal or state law, or (3) negligible. 16 U.S.C. § 1443(a)(1) and (3).

4. The Sanctuaries Act broadly defines "sanctuary resource" as "any living or nonliving resource of a national marine sanctuary that contributes to the conservation, recreational, ecological, historical, research, educational, or aesthetic value of the sanctuary." 16 U.S.C. § 1432(8).

5. Congress also may designate sanctuaries, as it did in 1990 when it passed the Keys Act. Pub.L. No. 101–605, 104 Stat. 3089 (1990). The Keys Act provides that the Sec-

---

5. The United States argues contextual information was lost because Defendants did not record sufficient information about the artifacts during their treasure-hunting activities. The United States contends it is entitled to $68,445 to conduct a scientifically performed analysis of the

impacted site and restore part of the lost contextual information.

6. To the extent that any Conclusions of Law represent factual findings, they are adopted as Findings of Fact.

retary of Commerce shall manage and police the Keys Sanctuary under the Sanctuaries Act. Keys Act § 5(a). Hence, anyone damaging Keys Sanctuary resources is liable to the government in the manner described in 16 U.S.C. § 1443. *Id.*

## B. Seagrass Damage

6. Among the Congressional findings in the Keys Act were that "spectacular, unique and nationally significant marine environments, including seagrass meadows," need protection through establishment of a marine sanctuary. *Id.* at § 2(2).

7. Seagrass is distributed in significant amounts along the Florida coast, and, in particular, the Florida Keys. It stabilizes the sea bottom and helps prevent erosion. It provides a habitat and a refuge for numerous small invertebrates, fish, and other organisms. It serves as an important base in the food chain. It helps recycle nutrients into ocean water.

8. The Court finds that seagrass is a resource within the meaning of both the Keys Act and the Sanctuaries Act. *See United States v. Fisher*, 22 F.3d 262, 265–66 (11th Cir.1994). Therefore, anyone who destroys or harms seagrass is strictly liable to the United States for damages unless that person has a defense under 16 U.S.C. § 1443(a)(1) or (3).

9. The Court also finds that Defendants injured and destroyed 1.63 acres of seagrass by using mailboxes to salvage for treasure in Coffins Patch in January, February, and March 1992. The evidence that supports this finding is:

a. Testimony from Kane Fisher and vessel logs indicating that mailboxes on the three boats made more than 600 blowholes in Coffins Patch during the first three months of 1992.

b. Testimony from Kane Fisher and Bancroft Thorne that no other salvagers were digging for treasure in Coffins Patch during that time.

c. Testimony from Bancroft Thorne that despite consistently running dive operations in Coffins Patch from 1987 through 1992, he never saw blowholes of the type at issue in this case until after Kane Fisher and the three boats left the area.

d. Testimony from Billy Causey that on March 23, 1992, he discovered blowholes with seagrass damage directly below a surface buoy left by Kane Fisher to mark the spot where he had salvaged in Coffins Patch.

e. Testimony from Billy Causey, Harold Hudson, Curtis Kruer, and Joseph Zieman that the blowholes they saw in Coffins Patch in March, April, and May 1992 had been made within the previous two months because (1) the exposed coral rubble was white and not fouled by algae, and (2) sediment remained on seagrass blades.

f. Testimony from Billy Causey, Harold Hudson, Curtis Kruer, and Joseph Zieman that the freshly made blowholes they observed had been made in the middle of seagrass beds because of the amount of displaced seagrass and the length of the blades of the remaining seagrass.

g. Testimony from Curtis Kruer and Joseph Zieman that the blowholes they observed had not been caused by nature because the holes were more symmetrical, steep, and deep than naturally caused craters.

h. Testimony from Joseph Zieman and the report of McIntosh Marine indicating that the blowholes damaged at least 1.63 acres of seagrass.

i. Testimony from Harold Wanless and Anitra Thorhaug that they did not view the area in question until after the March 1993 "Storm of the Century" had filled in the blowholes. Because the government's expert witnesses had an opportunity to view the damage before that storm, the Court finds their testimony on the nature and scope of the damage more credible than that of Wanless or Thorhaug.

10. For the same reasons as listed in Paragraph 9, the Court finds that the damage in question was not (1) caused by an act of God, an act of war, or the act or omission of a third party,[7] (2) caused by an

7. Specifically, the Court rejects the Defendants' arguments that either prior salvage operations or

activity authorized by federal or state law,[8] or (3) negligible. As a result, none of the liability exceptions listed in 16 U.S.C. § 1443 apply here.

11. Therefore, the Court finds that Defendants are liable to the United States under 16 U.S.C. § 1443(a)(1) for response costs and damages resulting from the destruction, loss, or injury of a Keys Sanctuary resource.

### C. Seagrass Restoration

12. Specifically, the United States is entitled to compensation for (1) the cost of replacing, restoring, or acquiring the equivalent of a sanctuary resource, and (2) the value of the lost use of a sanctuary resource pending its restoration or replacement, or the acquisition of an equivalent sanctuary resource. 16 U.S.C. § 1432(6)(A).

█ 13. Because the destroyed seagrass at Coffins Patch cannot be restored or replaced, the public must be compensated by the acquisition of an equivalent sanctuary resource. In order to compensate for the seagrass losses at Coffins Patch, a seagrass restoration project must be performed at another suitable location within the Sanctuary.

14. The Prop Scar Restoration Project developed by NOAA will provide seagrass services equivalent to those lost due to the injuries Defendants caused.

█ 15. The HEA is an appropriate methodology to scale the compensatory restoration project chosen by NOAA in this case.

16. According to the HEA, 1.55 acres of seagrass habitat must be restored under the Prop Scar Restoration Project to compensate for the interim services that will be lost at Coffins Patch as a result of Defendants' actions.

17. The estimated cost of implementing the Prop Scar Restoration Project—totaling $351,648—is reasonable and appropriate.

Accordingly, the United States is entitled to $351,648 from Defendants to implement the Prop Scar Restoration Project.

18. Under the Sanctuaries Act, the United States is also entitled to recover the cost of response and damage assessment. 16 U.S.C. §§ 1432(6)(C) & (7). Therefore, the United States shall recover assessment and response costs in the amount of $211,130 from the Defendants.

19. The United States is also entitled to recover interest on these assessment and response costs. 16 U.S.C. § 1443(a)(1)(B). Accordingly, the United States shall recover $26,533 in interest accrued on NOAA's assessment and response costs.

### D. Removal of Artifacts

█ 20. The Court finds that the artifacts Defendants recovered from Coffins Patch in 1992 are a sanctuary resource within the meaning of § 1432(8), as they are nonliving resources that contribute to the historical value of the sanctuary.

21. By removing these artifacts from the Sanctuary, Defendants caused the loss of sanctuary resources. 16 U.S.C. § 1443(a)(1)(A)

█ 22. Therefore, under the Sanctuaries Act, the United States is entitled to recover these artifacts. 16 U.S.C. § 1432(6).

23. This Court finds, however, that the United States is not entitled to receive compensation to professionally evaluate or curate the artifacts.[9]

24. The Court also concludes that the amount of archeological contextual information lost during Defendants' treasure-hunting activities was negligible. 16 U.S.C. § 1443(a)(3)(C). Accordingly, the Court also declines to award compensation for loss of contextual archeological information.

---

nature made the blowholes and caused the seagrass damage.

**8.** The Court ruled on this issue in its Summary Judgment Order of April 30, 1997.

**9.** The United States argues that, but for Defendants' activities, NOAA would not be forced to incur these costs. Accordingly, the United States contends it is entitled to $6,385 under 16 U.S.C. § 1432(6)(A)(i)(I). The Court is not persuaded that the statute entitles the United States to this relief.

### E. Injunctive Relief

25. The Sanctuaries Act empowers district courts to enjoin violations of the Act. 16 U.S.C. § 1437(i).

26. On July 23, 1992, this Court granted a preliminary injunction restraining the Defendants from using prop wash deflectors in the Keys Sanctuary. The Eleventh Circuit affirmed this Order. *United States v. Fisher*, 22 F.3d 262 (11th Cir.1994).

 27. The standard for entry of a permanent injunction essentially mirrors that of a preliminary injunction, except the plaintiff must show actual success on the merits rather than likelihood of success. *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987). In addition to success on the merits, a plaintiff must prove that it will suffer irreparable harm if the injunction is not granted, that the threatened injury outweighs the harm that granting the injunction would inflict on the defendant, and that the public interest will not be adversely affected if an injunction is granted. *In re Daytona Beach Gen. Hosp.*, 153 B.R. 947, 950 (Bkrtcy.M.D.Fla.1993).

28. By proving that the Defendants destroyed and lost sanctuary resources, the United States has established success on the merits.

29. The United States has also established that it will suffer irreparable harm if the injunction is not granted. The Court has found that Defendants' treasure-hunting activities in Coffins Patch in 1992, in particular their use of mailboxes, resulted in damage to and loss of Keys Sanctuary resources. Evidence at trial established that regrowth of seagrass damaged and destroyed by mailboxes will take 50 to 100 years. Allowing Defendants to continue to use mailboxes and remove artifacts would likely cause further, irreparable damage to Sanctuary resources.[10]

30. The scale and significance of the harm Defendants' treasure-hunting activities

caused outweighs any burden placed on the Defendants.

31. The public interest will not be adversely affected if this injunction is granted. Rather, the public interest will be served by the protection of Sanctuary resources.

 32. Accordingly, Defendants are permanently enjoined from using mailboxes and removing artifacts from the Keys Sanctuary without a permit issued by NOAA.[11]

33. The United States shall file a **proposed final judgment** within ten days from the date stamped on this Order.

---

**10.** This activity is now regulated by NOAA through the issuance of permits. *See* 15 C.F.R. §§ 922.163 and 922.166.

**11.** The Court reminds Defendants that, in addition to complying with this Court order, they are required to follow the law as stated in the Sanctuaries Act and its regulations.