**UNITED STATES of America,**
**Plaintiff,**

v.

**Dr. Ben H. JENKINS and The Church**
**of Verity, Inc., Defendants.**

**No. CV 208–149.**

United States District Court,
S.D. Georgia,
Brunswick Division.

Dec. 5, 2008.

Kenneth D. Crowder, U.S. Attorney's Office, Augusta, GA, for Plaintiff.

John J. Ossick, Jr., John J. Ossick, Jr., PC, Kingsland, GA, for Defendants.

## ORDER

LISA GODBEY WOOD, District Judge.

Defendant "The Church of the Verity, Inc." has possessory rights on an improved parcel of land within Cumberland Island National Seashore, a tract owned by the United States ("Plaintiff") and managed by the National Park Service. Defendant Dr. Ben Jenkins, The Church of the Verity's Chief Moderator and sole member, lives on that parcel. In 2007, Defendant Jenkins began constructing a new building and then a new septic system on the parcel. Alleging that the additional construction exceeded Defendant's property rights and prejudiced the Plaintiff's remainder interest, Plaintiff has brought trespass and nuisance claims against Defendant.

Presently before the Court is Plaintiff's motion for a preliminary injunction under Federal Rule of Civil Procedure 65. (Dkt. No. 5). The Court heard oral argument on this motion on November 25, 2008, a hearing date requested by both parties. Today, the Court **GRANTS** the motion in part and **DENIES** it in part. Specifically, the Court enjoins Defendants from performing any construction, installation or modification that involves additional digging or excavation, but declines to enjoin Defendant as to any construction, installation or modification that does not involve further digging or excavation. The injunction applies to the parcel on Cumberland Island now subleased to The Church of the Verity and on which Dr. Ben Jenkins now resides, which lies within former Carnegie Tract 1–S.

This Order is not a decision on the merits. Instead, the Court addresses only the precise question before it: whether Plaintiff is entitled to the extraordinary remedy of a preliminary injunction. This Court cannot issue an injunction unless Plaintiff shows "that [it] is likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Natural Resources Defense Council, Inc.,* —— U.S. ——, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). Because Plaintiff has failed to show that additional construction not involving digging or excavation will cause irreparable harm, the Court denies Plaintiff's motion to that extent. After finding that Plaintiff has met the prerequisites to preliminary injunctive relief as to further excavation, however, the Court issues an injunction to

that extent. In no event should anything in this Order be construed as a stamp of approval for Dr. Jenkins's actions or as pronouncement of which party will ultimately prevail on the merits.

In ruling on Plaintiff's motion for a preliminary injunction, the Court relies upon the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. The United States is the plaintiff in this action.

2. The challenged construction has occurred on a 7.5–acre parcel located within the Cumberland Island National Seashore ("Cumberland Island"), a tract of land owned by the United States and managed by the National Park Service ("NPS").

3. On October 8, 1970, the United States granted a 40–year estate for years in a different parcel located on Cumberland Island to Gertrude Schwartz, who was acting as trustee for Andrew Carnegie III. That parcel was located in former Carnegie Tract 4–S. (Dkt. No. 5 Ex. 2).

4. That estate for years will terminate on October 8, 2010.

5. The instrument granting Schwartz an estate for years specified that "[t]his grant of an Estate for Years is contingent upon the Grantee commencing and completing construction of a single-family residential dwelling within ten (10) years from the date of this conveyance. The right of construction shall be limited to a single-family residence." *Id.* It further provided that "[t]he Grantee, as Trustee, shall have the right to convey the beneficial interest under this Agreement to Andrew Carnegie, III, the primary beneficiary of said trust and/or his spouse, or his heirs." *Id.*

6. In 1978, Schwartz, again acting as trustee for Andrew Carnegie III, exchanged the Estate for Years in the original parcel for an identical estate for years in the parcel at issue in this litigation, which is located in former Carnegie Tract 1–S. (Dkt. No. 5 Ex. 3). The instrument memorializing the exchange provided that "it is the purpose and intent of this agreement to modify and amend the terms of the Estate for Years only so far as it relates to the land area and wharf location as described therein, and to reaffirm all other portions of the Estate for Years." *Id.*

7. Through a lengthy series of subleases, the 40–year estate for years passed to The Church of the Verity. Dr. Jenkins, whom the document identified as the church's "Chief Moderator," signed the sublease for The Church of the Verity. Each sublease in this sequence expressly provided that it would expire on August 8, 2010, two months before the original estate for years will terminate. (Dkt. No. 5 Ex. 4, 5).

8. Defendant Jenkins began residing on the parcel at issue after he built a house there in 1979. He resides there today. Hr'g Tr. 36.

9. Because Defendant has built a house on the parcel and has been living there for more than twenty years, the house and yard constitute a "disturbed area" that was not pristine when Defendant began the construction projects at issue here. Hr'g Tr. 50.

10. In early February 2007, Defendant Jenkins began constructing a building adjacent to the house he built in 1979. That addition is now 80–90% complete and is physically connected to the existing house by a covered but open-sided walkway. (Dkt. No. 5 Ex. 8 (blueprints), 11 (photograph from newspaper), 21 (report and photographs)); Hr'g Tr. 90, 92. The addition has independent plumbing and cooking facilities. Hr'g Tr. 31–32.

11. Most of the work remaining to be done on the addition is interior work. Hr'g Tr. 82, 91.

12. Initially, Defendant intended for the Shepherd Center, Inc., an entity that provides medical aid to people with spinal injuries, to use the addition to care for its patients. Dr. Jenkins signed a written agreement memorializing this arrangement between the Shepherd Center and The Church of the Verity as "Chief Moderator" of The Church of the Verity. (Dkt. No. 11); Hr'g 48, 124–25.

13. The Shepherd Center has since disclaimed any interest in the property at issue. (Dkt. No. 5 Ex. 16).

14. On March 9, 2007, after construction had begun, Defendant Jenkins wrote to the then-superintendent of Cumberland Island, Jerre Brumbelow, requesting permission to construct the addition. Defendant sent blueprints of the proposed structure to Mr. Brumbelow along with his letter. (Dkt. No. 5 Ex. 8).

15. On May 23, 2007, Jerre Brumbelow replied to Defendant in a letter that stated, "[y]our request to expand your residence on Cumberland Island is approved in accordance with your retained rights." (Dkt. No. 5 Ex. 10).

16. As Superintendent of Cumberland Island, Mr. Brumbelow spent significant time on the island and served as Defendant's "primary contact" with NPS. Hr'g Tr. 21. The island Superintendent was normally charged with granting or denying permission to island dwellers who asked to build. Hr'g Tr. 48; see also Hr'g Tr. 29.

17. On August 2, 2007, NPS wrote a letter to Defendant telling him to stop construction on the addition. (Dkt. No. 5 Ex. 14).

18. On May 5, 2008, Dennis Parsons, Cumberland Island's Chief Ranger, noticed that Defendant was installing a new septic system on the property at issue. Parsons told Defendant to stop work on the septic system. (Dkt. No. 5 Ex. 17).

19. The septic system that Mr. Parsons saw was designed to serve the new addition and involved substantial excavation. (Dkt. No. 5 Ex. 17, 18, 21). It is unclear whether completing installation of the septic system would involve additional excavation, or whether all required excavation has been completed. Hr'g Tr. 83, 92–93.

20. On May 8, 2008, NPS wrote a letter to Defendant telling him to stop installation of the septic system. Defendant wrote "BULL SHIT" on the letter and sent it back. (Dkt. No. 5 Ex. 19).

21. On June 30, 2008, an NPS ranger visited Defendant's property and saw that Defendant was continuing to install the septic system. The ranger told Defendant to stop, and Defendant refused. The ranger then issued a citation. (Dkt. No. 5 Ex. 20).

22. Art Frederick has been an NPS employee since 1978. He was the Superintendent of Cumberland Island before Jerre Brumbelow assumed that post, and has since been promoted to the NPS Deputy Regional Director for the Southeastern Region. Hr'g Tr. 13–14.

23. The Court asked Mr. Frederick why the challenged construction caused irreparable harm to Plaintiff and NPS. Mr. Frederick responded, in part, as follows:

> MR. FREDERICK: What we're primarily concerned about here is what is beneath the surface, the Archeological Resource Protection Act, Native American Grave Protection and Repatriation Act. So we have to be mindful of when one constructs something on Cumberland Island, be mindful of not doing something that would impair the resources. All the resources on Cumberland Island should be protect-

ed if we're going to maintain the park in a primitive state. And we have to be mindful of protecting those resources.

COURT: Is it your testimony that there is a likelihood that Native American artifacts or Native American remains could go unearthed during further construction?

MR. FREDERICK: That's true ...

Hr'g Tr. 37–38.

24. Defendant did not challenge Mr. Frederick's qualifications to testify about the presence of Native American remains and artifacts on the parcel.

25. John Fry serves as Chief of Resources Management for Cumberland Island, and was employed by NPS in that capacity in early 2007 when Defendant began construction of the addition. Fry Aff. ¶¶ 1, 2 (Pl.'s Ex. 22). As part of his duties, Mr. Fry determines whether proposed building projects on Cumberland Island will have detrimental environmental or archaeological effects. Hr'g Tr. 85 (testimony of Dennis Parsons), 121 (testimony of Jerre Brumbelow).

26. Jerre Brumbelow testified that, when deciding how to react to Defendant's construction of the addition, "I had sent John Fry out there. And he came back and said, 'I don't see any potential archeological problems here.' So I said, 'Good. We don't have a lot to worry about from the resource standpoint.'" Hr'g Tr. 121.

27. Contrary to Mr. Brumbelow's recollection, Mr. Fry testified by affidavit that "[t]here is ... a possibility that archeological artifacts were disturbed by the construction." Fry Aff. ¶ 8 (Pl.'s Ex. 22).

Mr. Fry further testified that "a small intermittent stream flows close to the site of construction and may be affected by it. Because construction [had] already commenced before my first site visit, I am not sure whether this stream was impacted by the construction." *Id.* at ¶ 7.

28. A report prepared by NPS employee Jeremy Bret Nickels stated that "unintended environmental deficiencies may occur if appropriate corrective actions are not taken before start-up" of the septic drainfield. NPS Field Notes at 11 (Dkt. No. 5 Ex. 21).

29. After the original term of years expires in 2010, NPS can raze any buildings that Defendant erects. Hr'g Tr. 40 (testimony of Mr. Frederick).

30. Defendants offered the only evidence about how completing the 10–20% of construction on the addition that remains incomplete would affect demolition costs.[1] The evidence established that completing construction of the building would not materially increase the cost of subsequent demolition because (1) the building is already 80–90% completed, (2) most of the work remaining on the structure is interior work, and (3) most of the building materials not already installed are stored on-site. Hr'g Tr. 88.

31. Completing work on the building is unlikely to require further excavation. Hr'g Tr. 90.

32. The addition, when and if completed according to plan, will be wheelchair-accessible. Hr'g Tr. 26–27, 32. 116.

33. Currently, the publicly available portions of Cumberland Island offer only lim-

---

1. Plaintiff elicited some testimony about demolition costs during Plaintiff's cross-examination of Jerre Brumbelow. That testimony, however, referred to how demolition costs would rise "from the footer stage to the 80 or 90 percent construction phase," not how demolition costs would rise between the present point, with the construction 80–90% complete, and the point at which construction is 100% complete. Hr'g Tr. 126.

ited wheelchair-accessible facilities to visitors. Hr'g Tr. 65–67, 115–16.

### CONCLUSIONS OF LAW

1. Because the United States is the plaintiff, this Court has jurisdiction under 28 U.S.C. § 1345. *See also Glidden Co. v. Zdanok*, 370 U.S. 530, 563–64, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962) (article III permits federal jurisdiction when United States is plaintiff).

■ 2. "A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 129 S.Ct. at 376.

■ 3. A plaintiff seeking a preliminary injunction must make four showings: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 374.

4. The Plaintiff must clearly meet the burden of persuasion on these four issues. *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir.2003); *accord Winter*, 129 S.Ct. at 375–76.

■ 5. When a court issues an injunction, the court's order must "state its terms specifically" and must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civil Proc. 65(d)(1); *accord Schmidt v. Lessard*, 414 U.S. 473, 475–77, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974); *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1203 (11th Cir.2001).

### LIKELIHOOD OF SUCCESS ON THE MERITS

6. Plaintiff has brought claims in trespass and nuisance. Compl. at 8, 10 (Dkt. No. 1).

■ 7. In order to demonstrate that it is likely to prevail on the merits, Plaintiff need only demonstrate the likelihood of prevailing on one cause of action. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1298, 1299 (11th Cir.2005).

8. Georgia law defines "trespass" broadly. In Georgia, "[t]he right of enjoyment of private property being an absolute right of every citizen, every act of another which unlawfully interferes with such enjoyment is a tort for which an action shall lie." O.C.G.A. § 51–9–1; *see also Sams v. Young*, 217 Ga. 685, 686, 124 S.E.2d 386 (1962); ("any unlawful interference with a property right is a trespass"); *accord Lugue v. Hercules, Inc.*, 12 F.Supp.2d 1351, 1359 (S.D.Ga.1997).

■ 9. To prove a trespass, therefore, Plaintiff must show that Defendant's construction of a new building and installation of a septic system unlawfully interfere with Plaintiff's remainder interest.

10. Because Defendant claims his rights in the parcel through Gertrude Schwartz, Defendant can have no greater property rights than Ms. Schwartz had. *Armour v. Peek*, 271 Ga. 202, 202–03, 517 S.E.2d 527 (1999).

11. Therefore, Defendant is bound by the restriction in the deed to Ms. Schwartz that "[t]he right of construction shall be limited to a single-family residence." (Dkt. No. 5 Ex. 2).

12. Because the addition on which Defendant proposes to complete construction (1) is spatially separate from Defendant's house, connected only by an open-sided walkway, (2) is furnished with bathrooms

and cooking facilities, and (3) was designed for use by the Shepherd Center, not by Defendant's family, Plaintiff will likely— although not certainly—be able to prove that it is not part of a "single-family residence." (Dkt. No. 5 Ex. 8, 11, 21); (Dkt. No. 11); Hr'g Tr. 25–26, 31–32, 45, 48.

13. Because the new septic system is designed to serve the new addition, not the existing house, Plaintiff will likely be able to show that the new system does not come within the "single-family residence" limitation on construction. (Dkt. No. 5 Ex. 17, 18).

14. Because Plaintiff will likely be able to prove that neither the new building nor the new septic system come within the "single-family residence" limitation on construction, Plaintiff will probably be able to prove that both the construction of the building and the installation of the septic system constitute "unlawful interferences" with Plaintiff's remainder interest.

15. Superintendent Brumbelow's letter authorizing construction will probably not estop Plaintiff from asserting that the construction was unauthorized. Case law expresses extreme reluctance to allow estoppel to work against the government, and suggests that "affirmative misconduct" might be a prerequisite to government estoppel. *Schweiker v. Hansen,* 450 U.S. 785, 790–91, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981); *Office of Personnel Mgmt. v. Richmond,* 496 U.S. 414, 423–24, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990); *Bokum v. C.I.R.,* 992 F.2d 1136, 1141, 1141 n. 6 (11th Cir.1993); *Deltona Corp. v. Alexander,* 682 F.2d 888, 891–92 (11th Cir.1982).

16. The Court concludes that Plaintiff has a strong, though not impregnable, trespass claim as to both the new building and the septic system. Therefore, Plaintiff has demonstrated a likelihood of success on the merits as to both projects.

17. Because Plaintiff has demonstrated that it is likely to succeed on the trespass claim, the Court does not assess the viability of Plaintiff's nuisance claim.

## LIKELIHOOD OF IRREPARABLE HARM

18. Before the Court may issue a preliminary injunction, the Plaintiff must show that irreparable harm is not merely possible, but likely. *Winter,* 129 S.Ct. at 375 (rejecting "possibility" standard as too lenient and writing, "[o]ur frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." (emphasis in original)).

19. The "irreparable injury" must be likely to occur after the plaintiff's request for an injunction and before resolution of the case on the merits—i.e., it must constitute future harm. *Jayaraj v. Scappini,* 66 F.3d 36, 40 (2d Cir.1995); *accord Alabama v. U.S. Army Corp. of Eng'rs,* 424 F.3d 1117, 1131 (11th Cir.2005) (plaintiff must show that "irreparable injury will occur during the pendency of the suit unless the injunction issues").

20. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir.1981); *accord Reese v. Miami–Dade County,* No. 02–16855, 2003 WL 22025458, at *1 (11th Cir. July 14, 2003) (unpublished opinion).

21. A court may more readily find that an environmental injury is "irreparable" because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction

to protect the environment." *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).[2]

22. Plaintiff presented evidence that further excavation will likely cause Native American artifacts to be unearthed. Specifically, when the Court asked Mr. Frederick, the former Superintendent of Cumberland Island and the current Deputy Regional Director for the Southeastern Region, whether there was "a likelihood that Native American artifacts or Native American remains could go unearthed during further construction," Mr. Frederick responded affirmatively. Hr'g Tr. 38.

23. Mr. Frederick's testimony is compatible with, albeit stronger than, Mr. Fry's affidavit, which stated that "[t]here is . . . a possibility that archeological artifacts were disturbed by the construction." Fry Aff. ¶ 8 (Pl.'s Ex. 22).

24. Mr. Frederick's testimony establishes that there is a likelihood that further excavation would cause archeological injury.

25. Harming Native American artifacts would constitute an irreparable injury because artifacts are, by their nature, unique, and their historical and cultural significance make them difficult to value monetarily. *U.S. v. Fisher,* 977 F.Supp. 1193, 1202 (S.D.Fla.1997) (removal of artifacts constitutes irreparable injury); *see MacGinnitie v. Hobbs Group, LLC,* 420 F.3d 1234, 1242 (11th Cir.2005) (harm that is difficult to assess monetarily can be irreparable); *Ferrero v. Assoc. Materials, Inc.,* 923 F.2d 1441, 1449 (11th Cir.1991) (same).

26. Because Plaintiff has shown that archeological harm is likely, and because archeological harm would be irrepa-

rable, Plaintiff has shown a likelihood of irreparable injury as to archeological harm caused by excavation.

27. Plaintiff has shown a possibility of environmental, non-archeological harm. Mr. Fry's affidavit posited that a small stream near the construction site "may be affected" by construction, and Mr. Nickels's report stated that "environmental deficiencies may occur" if Defendant begins using the septic drainfield. Fry Aff. at ¶ 7 (Pl.'s Ex. 22); NPS Field Notes at 11 (Dkt. No. 5 Ex. 21).

28. Although Plaintiff has shown that an environmental injury is possible, Plaintiff has not demonstrated that such an injury is likely. *See Winter,* 129 S.Ct. at 375–76 (Plaintiff must show that environmental injury is "likely" before preliminary injunction may issue).

29. Plaintiff argues that by beginning construction before NPS could assess the environmental resources of the construction site, Defendant made it impossible for Plaintiff to ascertain the extent of the harm that construction would cause. Pl.'s Mem. at 14 (Dkt. 5 Attach. 1); Hr'g 41, 147. Therefore, Plaintiff suggests, Defendant impaired Plaintiff's ability to demonstrate irreparable environmental harm, and as a result, this Court should relax the "irreparable injury" requirement. *See Winter,* 129 S.Ct. at 392 (Ginsburg, J., dissenting) (advancing similar argument).

30. To satisfy the "irreparable injury" prong, however, Plaintiff must allege a future injury, i.e., one that will occur after the plaintiff's request for a preliminary injunction. *Jayaraj,* 66 F.3d at 40; *Alabama,* 424 F.3d at 1131. Defendant's construction to date, even if it has already

---

**2.** Although courts may accept lower quanta of proof to determine that environmental injuries are "irreparable," plaintiffs asserting en-

vironmental injuries must nevertheless fully demonstrate that those injuries are "likely." *Winter,* 129 S.Ct. at 375–76.

caused irreparable damage, has not impaired Plaintiff's ability to discover what environmental harm future construction would cause.

31. In short, Defendant's conduct, even if reprehensible, did not impede Plaintiff's ability to gather and adduce evidence of future harm. Therefore, relaxation of the requirement that a plaintiff demonstrate the likelihood of future harm is not warranted, and Plaintiff was charged with fulfilling that requirement. Plaintiff failed to do that with respect to environmental harm.

32. Plaintiff alleges that if the Court allows Defendant to continue building, Defendant's success will undermine "the ability of the [National Park] Service to deal with other retained estates, and its credibility with the public in general." Pl.'s Orig. Br. at 14 (Dkt. No. 5 Attach. 1). Plaintiff, however, has provided no credible evidence that NPS's "credibility with the public in general" will be injured, at least as a result of the partial denial of a preliminary injunction. The Court notes, however, that some citizens may wonder why NPS originally granted permission to complete the construction that Plaintiff now insists will irreparably injure its reputation.

33. In sum, Plaintiff has demonstrated that continued digging or excavation would create a likelihood of irreparable injury to subterranean archeological resources. Plaintiff has failed to demonstrate, however, that further construction not involving digging or excavation is likely to cause irreparable harm.

## BALANCE OF THE EQUITIES

34. When a District Court grants a preliminary injunction, it should weigh the equities carefully. Cursory analysis is insufficient. *Winter*, 129 S.Ct. at 378.

35. Several equitable considerations weigh in Plaintiff's favor. NPS's mission is to keep all of Cumberland Island—disturbed and non-disturbed areas alike—as pristine as possible, so that in time, those portions of the island that NPS does not "deem [ ] to be especially adaptable for recreational uses" will revert to their primitive states. 16 U.S.C. § 459i–5; Hr'g Tr. 37, 56–58. Currently, the surface of the parcel on which Defendant lives is a "disturbed area." Hr'g Tr. 50. Much of the subsurface, however, is undisturbed. *See* Hr'g Tr. 37 (digging required to install septic system would lead to "further footprint damage"). In light of NPS's statutory mission, NPS's interest in keeping the subsurface undisturbed counsels in Plaintiff's equitable favor, especially as to any construction that involves further excavation.

36. A preliminary injunction ordering Defendant to stop any construction that involves excavation will not cause undue difficulty to Defendant. Such an injunction will probably permit Defendant to complete much of the work on the addition, which is mainly interior work and should not require further excavation. Hr'g Tr. 82, 90, 92. Such an injunction will probably prevent Defendant from completing work on the septic system, at least for now, but Defendant has gotten by with only the existing septic system since 1979– Defendant can wait until this Court reaches the merits of the instant dispute to finish installing the new system, if he is entitled to do so.

37. Some equitable factors favor Defendant. For instance, Defendant has nearly completed construction on a handicapped-accessible building that is well-constructed and "built to last." Hr'g Tr. 26–27, 32, 115–16. Given the limited wheelchair-accessible facilities on Cumberland Island,

NPS might want to keep the house for its own use after the Term of Years expires in 2010. Hr'g Tr. 65–66, 113–14, 116. The new septic system will serve that new building. (Dkt. No. 5 Ex. 17, 18). The Court notes, however, that what use NPS will make of the addition in 2010 is up to NPS, not Defendant.

38. Defendant could reasonably have relied on Superintendent Brumbelow's letter permitting him to proceed with construction, since the superintendent was Defendant's "primary contact" with NPS and probably had "apparent authority." (Dkt. No. 5 Ex. 10); Hr'g Tr. 21, 29, 48.

39. However, Defendant's delay in asking permission to build until after commencing construction and Defendant's refusal to stop installing the septic system after being directed to do so undercut any argument that Defendant relied on NPS's permission in pursuing his course of conduct. (Dkt. No. 5 Ex. 18, 19, 20). Moreover, the evidence indicated that Defendant did not request permission to build until Superintendent Brumbelow saw the ongoing construction and told Defendant that he should have asked permission before commencing construction. Hr'g Tr. 107–08.

40. Defendant's disregard for authority works against Defendant. Although Defendant halted construction on the addition after receiving NPS's August 8, 2007 letter, Defendant subsequently began installing a septic system without permission from NPS. (Dkt. No. 5 Ex. 17); Hr'g Tr. 11, 35–36. Defendant then refused to stop the installation until NPS issued a citation despite being thrice instructed to stop. (Dkt. No. 5 Ex. 17, 18, 19, 20). Defendant offered the most poignant expression of his contempt, however, upon receipt of NPS's May 8, 2008 letter instructing him to stop installing the septic system—he wrote "BULL SHIT" on the letter and sent it back. (Dkt. No. 5 Ex. 19). Equity does

not shine on those with unclean hands, and those of the sole member of The Church of the Verity are less than sanitized with regard to this incident.

41. Upon weighing the above factors, the Court concludes that the balance of the equities favors Plaintiff.

## PUBLIC INTEREST

42. The public has a strong interest in preserving Cumberland Island in a primitive state and preserving any artifacts that remain in the soil. *Fisher,* 977 F.Supp. at 1202 (preservation of artifacts in natural setting serves public interest); *see also Nat'l Wildlife Federation v. Marsh,* 721 F.2d 767, 786 (11th Cir.1983) ("Issuance of the injunction will serve the public interest, given the substantial issues involved both as to the proper use of federal funds and protection of the environment.").

43. Congress has established that the maintenance of Cumberland Island in a primitive state is a public policy goal. 16 U.S.C. § 459i–5.

44. On the other hand, the public has an interest in seeing that the rights of individuals are not trammeled by government bureaucracies. Here, however, the evidence at this juncture does not show that NPS is attempting to run roughshod over Defendant's rights.

45. The Court concludes that the public interest favors Plaintiff.

## *CONCLUSION*

Plaintiff has met *Winter's* four prerequisites for a preliminary injunction as to further excavation on the parcel, but not as to construction or installation that does not require further excavation. 129 S.Ct. at 374. Therefore, the Court **GRANTS** Plaintiff's motion for a preliminary injunc-

tion in part and **DENIES** the motion in part. (Dkt. No. 5).

The Court enjoins Defendant from conducting any construction, installation, modification of the property, or any other work on the parcel that involves further excavation or digging. This injunction does not prohibit Defendant from continuing construction or installation that requires no further excavation or digging. The injunction applies to the parcel on Cumberland Island now subleased to The Church of the Verity and on which Dr. Ben Jenkins now resides, which lies within former Carnegie Tract 1–S.

For purposes of this injunction, digging or excavation in order to obtain "fill"—i.e., material needed to fill an existing hole—constitutes prohibited excavation.