**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2017

(Argued: February 28, 2018       Decided: March 22, 2019)

Docket No. 17-881

—————————————————

Metropolitan Life Insurance Co.,

*Plaintiff-Appellee,*

v.

John Bucsek,

*Defendant-Appellant.*

—————————————————

Before:

KATZMANN, *Chief Judge*, LEVAL, *Circuit Judge*, and CARTER, *District Judge*.[*]

Defendant John Bucsek, a former employee of Plaintiff Metropolitan Life Insurance Company, appeals from an order of the United States District Court for the Southern District of New York (Paul A. Engelmayer, *J.*) granting MetLife a preliminary injunction barring Bucsek from arbitrating his claims before the Financial Industry Regulatory Authority (FINRA). The district court held that 1) the question whether MetLife was obligated to arbitrate the dispute was to be decided by a court, rather than an arbitrator, and 2) MetLife

[*] Judge Andrew L. Carter, of the United States District Court for the Southern District of New York, sitting by designation.

1

was not required by the FINRA arbitration code to arbitrate claims arising out of events that occurred long after MetLife's withdrawal from FINRA's predecessor, the National Association of Securities Dealers. AFFIRMED.

JACK A. GORDON (Joshua Katz, *on the brief*), Kent, Beatty & Gordon, LLP, New York, NY, Christopher C. Coss, Coss & Momjian, LLP, Bala Cynwyd, PA, *for Plaintiff-Appellant*.

KENNETH J. TURNBULL (Rudolph J. Burshnic II, *on the brief*), Morgan, Lewis & Bockius LLP, New York, NY, *for Defendant-Appellee*.

LEVAL, *Circuit Judge*:

Defendant John Bucsek, a former employee of Plaintiff Metropolitan Life Insurance Company ("MetLife"), appeals from an order of the United States District Court for the Southern District of New York (Paul A. Engelmayer, *J.*) granting MetLife's motion for a preliminary injunction barring Bucsek from pursuing claims against MetLife in arbitration, rather than in court. Bucsek had instituted an arbitration before the Financial Industry Regulatory Authority ("FINRA"), the successor to the National Association of Securities Dealers ("NASD"). MetLife had been a member of the NASD during the early part of Bucsek's employment. MetLife argues that it has no obligation to arbitrate Bucsek's claims because they are based on

events that occurred long after MetLife and Bucsek ceased to have any connection with the NASD. The District Court ruled in MetLife's favor, staying arbitration of Bucsek's claims. We affirm.

**BACKGROUND**

In 2002, Bucsek joined MetLife's retail distribution channel, which later became known as the MetLife Premier Client Group. He served as Co-Managing Partner and was registered with the NASD as a securities industry representative of MetLife. During the first several years of Bucsek's employment at MetLife, until 2011, MetLife was a member of the NASD.

As an NASD member, MetLife was subject to the NASD Code of Arbitration Procedure ("NASD Code"), which required arbitration of disputes between members and "person[s] associated with a member." Rule 10201, NASD Code. Bucsek, then a registered representative of a member, was a "person associated with a member," as defined in the NASD Bylaws. *See* NASD Bylaws, Art. I (rr).

Bucsek, upon joining MetLife, was required to sign a Form U-4, "Uniform Application for Securities Industry Registration or Transfer," which contained an agreement to arbitrate. It provided:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm . . . that is required to be arbitrated under the rules, constitutions, or by-laws of [the NASD] . . . as may be amended from time to time . . . .[1] App. 97-98.

On July 9, 2007, MetLife terminated its membership in the NASD. On July 30, 2007, the NASD merged with parts of the New York Stock exchange to form FINRA and the NASD code was replaced by the FINRA Code. MetLife never became a member of FINRA.

Bucsek's employment at MetLife continued for nine years after MetLife severed its connection with the NASD, until July 1, 2016, when Massachusetts Mutual Life Insurance Company acquired the MetLife Premier Client Group.

On July 11, 2016, Bucsek filed a Statement of Claim in arbitration before FINRA, asserting claims related to unfair compensation, including breach of contract, fraud, negligence, and violation of the New Jersey Wage Payment Law, N.J.S.A §§ 34.11–4.1 et seq. His claims relate to his employment by MetLife during the period from 2011 (four years after MetLife's 2007

---

[1] The arbitration clause does not specifically name the NASD, but rather expresses Bucsek's agreement to arbitrate any dispute "that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs [Self-Regulatory Organizations] indicated in Section 4 (SRO Registration) . . . ." App. 97. The parties agree that by signing the Form U-4, Bucsek registered with the NASD and agreed to arbitrate disputes before it. Accordingly, we conclude that Bucsek agreed to arbitrate disputes before the NASD pursuant to his Form U-4 arbitration clause.

withdrawal from the NASD) until the end of his employment at MetLife in 2016.

MetLife submitted a letter-motion to FINRA seeking dismissal of Bucsek's claims, arguing that it was not required by the Code to arbitrate this dispute. By order of the Director of the FINRA Office of Dispute Resolution on December 1, 2016, FINRA denied MetLife's application for dismissal.

On February 2, 2017, MetLife filed this this action in the United States District Court for the Southern District of New York seeking a preliminary and permanent injunction barring Bucsek from pursuing the arbitration. The district court found that MetLife had shown probability of success on the merits and granted a preliminary injunction staying the arbitration. Bucsek brought this appeal.

## DISCUSSION

Bucsek contends that the District Court erred both in finding that MetLife had shown probability of success as to the non-arbitrability of the

dispute, and in ruling on the question of arbitrability, rather than leaving it to the arbitrators.[2]

The provisions of the arbitration code are central to both of Bucsek's contentions. It is not entirely clear whether the governing code for this dispute is the NASD Code, to which MetLife and Bucsek were undoubtedly subject from the time Bucsek began his employment at MetLife until MetLife withdrew from membership, or the FINRA Code, which replaced the NASD Code when, subsequent to MetLife's withdrawal from the NASD, the NASD was replaced by FINRA. For purposes of this dispute at least, the main

---

[2] Grants (and denials) of preliminary injunctions are reviewed for abuse of discretion; the adjudication of questions of law in deciding whether to grant a preliminary injunction is reviewed de novo. *See Goldman Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 764 F.3d 210, 214 (2d Cir. 2014) ("When reviewing an order granting either a preliminary or a permanent injunction, we review the district court's legal holdings de novo and its ultimate decision for abuse of discretion."). A party seeking a preliminary injunction must establish 1) a likelihood of success on the merits, 2) a likelihood of irreparable harm absent relief, 3) that the balance of equities was in its favor, and 4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Because Bucsek bore the burden of proof to show arbitrability of the dispute, MetLife's burden on its motion for a preliminary injunction barring the arbitration operates differently from the more conventional case in which the party seeking an injunction also bears the burden of proof on the issue in dispute. MetLife's burden accordingly was to show likelihood of success in showing that Bucsek could not succeed in showing entitlement to arbitrate. However, as the facts with respect to MetLife's obligation to arbitrate are substantially undisputed, and the issues in contention relate entirely to questions of law, the assignment of burdens of proof is of little or no consequence for the resolution of this appeal.

pertinent provisions of the two Codes are functionally identical, and, to the

extent that they differ, the difference would not change our conclusions. We

therefore find it unnecessary to decide which of the two Codes governs.

Because the parties and the District Court have assumed that the FINRA Code

governs, we will focus on its provisions, noting differences from NASD's

Code where appropriate.

FINRA Rule 13200 (which is substantially identical for our purposes to

NASD Code Rule 10101) provides:

> [A] dispute must be arbitrated under the Code if the
> dispute arises out of the business activities of a member or
> an associated person and is between or among: Members;
> Members and Associated Persons; or Associated Persons.

For purposes of this provision, it is undisputed that, until MetLife withdrew

from the NASD in 2007, it was a "member" and Bucsek was an "associated

person."

FINRA Rule 13413 (which is substantially identical for our purposes to

NASD Rule 10324) provides:

> The panel has the authority to interpret and determine the
> applicability of all provisions under the Code. Such
> interpretations are final and binding upon the parties.

FINRA Rule 13100 defines "member" as:

> [A]ny broker or dealer admitted to membership in FINRA, whether or not the membership has been terminated or cancelled. . . .

The first clause of this rule, defining a member as "any broker or dealer admitted to membership" is functionally identical to the NASD's definition of membership set forth in its Bylaws. *See* NASD Bylaws, Art. I (ee). The second clause (relating to survival of membership after termination or cancellation) was not a part of the NASD's definition of membership.

Bucsek contends the district court erred in undertaking to decide whether his dispute was subject to the arbitration agreement, rather than referring that issue to the arbitrator. In general, what is determinative for deciding whether the arbitrability of a dispute is to be resolved by the court or by the arbitrator is the arbitration agreement. Just as the parties may elect through their contract to have arbitrators (rather than a court) resolve categories of disputes between them, they may similarly contract to have arbitrators (rather than a court) decide whether a particular dispute is to be arbitrated under the terms of the contract. We refer to the latter issue as the question of "arbitrability" of the dispute. The Supreme Court recently ruled in *Henry Schein Inc. v. Archer & White Sales, Inc.*, 139 S.Ct. 524 (2019), that,

when the parties have contracted to submit the question of the arbitrability of a dispute to arbitrators, courts must respect and enforce that contractual choice. There are many reasons why the parties to a business relationship might wish to have the arbitrability question, as well as all aspects of future disputes between them, decided by arbitrators, rather than by the courts. They might regard court proceedings as too slow, too expensive, too burdensome, or too public. They might prefer to rely on arbitrators who are familiar with the habits and customs of their area of commerce. They might prefer to have the entire matter heard in one forum, rather than two. Regardless of their reasons (and even in the absence of reasons), parties are free to enter into a binding contract by which either party can compel the other to have every aspect of a future dispute between them, including its arbitrability, determined by arbitrators. *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 66, 69 (2010) (finding that an arbitration agreement giving the arbitrators "exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this contract" empowered the arbitrators to resolve arbitrability of an unconscionability claim).

On the other hand, persons involved in a dispute are ordinarily entitled to have access to a court for the resolution of the dispute. It is a fundamental tenet of law that only by agreeing to arbitrate does a person surrender the right of access to a court for the resolution of a legal dispute that is subject to adjudication. *See AT & T Techs., Inc. v. Comms. Workers of America*, 475 U.S. 643, 648 (1986) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. This axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." (internal quotation marks and citations omitted)). The right of access to courts is of such importance that courts will retain authority over the question of arbitrability of the particular dispute unless "the parties clearly and unmistakably provide[d]" that the question should go to arbitrators. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). This rule is designed to guard against "the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate." *Id.* at 83-84. Were the courts to cede to arbitrators resolution of the arbitrability of the dispute (absent the clear and unmistakable agreement of the parties to that

effect), this would incur an unacceptable risk that parties might be compelled to surrender their right to court adjudication, without their having consented. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1995). In *Henry Schein*, the Supreme Court recently reaffirmed the proposition of *First Options* that courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Henry Schein*, 139 S.Ct. at 531 (quoting *First Options*, 514 U.S. at 944). Accordingly, in the absence of an arbitration agreement that clearly and unmistakably elects to have the resolution of the arbitrability of the dispute decided by the arbitrator, the question whether the particular dispute is subject to an arbitration agreement "is typically an issue for judicial determination." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010) (internal citation and quotation marks omitted).

The result of these principles is that, to determine whether the issue of arbitrability of this dispute should be resolved by an arbitrator rather than the court, we must examine the parties' agreement to determine whether they clearly and unmistakably agreed to have that issue resolved by arbitrators. If

the parties so agreed, it is the obligation of the court to enforce their agreement. *See Henry Schein*, 139 S.Ct. at 530; *Rent-A-Ctr.*, 561 U.S. at 69–70.

We therefore turn to the arbitration Code to determine whether, in either the NASD or the FINRA version, it reflects a clear and unmistakable agreement by the parties to have the question of arbitrability of this dispute determined by arbitrators rather than the court.

Neither version of the Code directly addresses the question. At least so far as reflected in the court opinions that have focused on this question, rarely do arbitration agreements directly state whether the arbitrator or the court will decide the issue of arbitrability. In the absence of language that directly addresses the issue, courts must look to other provisions of the agreements to see what contractual intention can be discerned from them. Broad language expressing an intention to arbitrate all aspects of all disputes supports the inference of an intention to arbitrate arbitrability, and the clearer it is from the agreement that the parties intended to arbitrate the particular dispute presented, the more logical and likely the inference that they intended to arbitrate the arbitrability of the dispute. *See, e.g.*, *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 394, 396 (2d Cir. 2018) (A clause expressing

agreement "to arbitrate any dispute, claim or controversy that may arise between you and Wells Fargo Advisors, or a client, or any other person[, and] . . . giving up the right to sue Wells Fargo Advisors . . . in court concerning matters related to or arising from your employment" "demonstrate[d] the parties' clear and unmistakable intent to arbitrate all questions of arbitrability."); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) (A contractual provision that "any and all controversies . . . concerning any account, transaction, dispute or the construction, performance, or breach of this or any other agreement . . . shall be determined by arbitration" and that "the parties are waiving their right to seek remedies in court" was found to "evidence the parties' intent to arbitrate all issues, including arbitrability.") (emphases omitted).

In contrast, the clearer it is that the terms of the arbitration agreement reject arbitration of the dispute, the less likely it is that the parties intended to be bound to arbitrate the question of arbitrability, unless they included clear language so providing, and vague provisions as to whether the dispute is arbitrable are unlikely to provide the needed clear and unmistakable inference of intent to arbitrate its arbitrability. Accordingly, what the

arbitration agreement says about whether a category of dispute is arbitrable can have an important bearing on whether it was the intention of the agreement to confer authority over arbitrability on arbitrators.

1. *FINRA Rule 13100 and the Arbitrability of Bucsek's claims*. The NASD/FINRA Code cannot reasonably be interpreted to provide for arbitration of Bucsek's claims. This is because his claims are based on events that occurred years after he and MetLife had ceased to have any connection with the NASD.[3] The claims relate to events for which the NASD and FINRA have no regulatory interest.

Bucsek contends this is irrelevant because FINRA Rule 13100 provides that a broker or dealer once admitted to membership continues to be a member "whether or not the membership has been terminated or canceled." According to his interpretation of this rule, an entity that was once a member remains a member subject to the arbitration Code forever as to any future dispute with a party against which it would have been required to arbitrate

---

[3] Bucsek contends that his claims also challenge MetLife's dealings with him during the time of MetLife's membership in the NASD, but this argument is meritless. While it is true that Bucsek's claims make vague, passing references to his "entire" employment at MetLife, all of the allegations of wrongdoing—primarily denials of requests for a raise and payment errors—are alleged to have occurred between 2011 and 2016, years after MetLife's withdrawal from the NASD.

during its active membership. MetLife opposes his position on two grounds.

First, it argues that it is not subject to FINRA Rule 13100 because it was never a member of FINRA, and this clause of FINRA Rule 13100 was not a part of the NASD Code to which it was subject. Second, MetLife argues that Bucsek's interpretation distorts this provision and produces preposterous results.

We need not decide whether MetLife is subject to a provision of the FINRA Code that was not a part of the NASD Code, because Bucsek's asserted interpretation of Rule 13100 is untenable and would produce absurd results that could not have been intended by FINRA or any of the contracting parties that subjected themselves to the FINRA Code.

Bucsek's proposed interpretation would mean that all persons or entities that were ever subject to FINRA's arbitration Code would forever remain subject to it with regard to future disputes between them, even if the dispute concerned events that occurred years, decades, or even centuries after either of the parties to the dispute had ceased to have any connection with FINRA.

Suppose, for example, that two business entities were FINRA members for the same brief period of time, and that each soon thereafter abandoned the

securities business, withdrew from FINRA, and went on to conduct business in completely different areas of enterprise. Decades or centuries later, a new business dispute arose between them that had nothing to do with FINRA, with the securities business, or with the past experiences of either of them during the brief, long-forgotten time when they were both members of FINRA. Bucsek's interpretation of Rule 13100 would mean that the dispute must be arbitrated because each entity had, in perpetuity, surrendered its right to have new disputes between them adjudicated by a court of law, and had instead committed itself in perpetuity to arbitrate any such disputes before FINRA.

Similarly, in the context of disputes between employer and employee, Bucsek's interpretation would mean that, if a registered representative entered the employ of an NASD member, in contemplation of the member and the representative immediately quitting the securities business and embarking together in a different unrelated field of business, then for as long as the employment relationship continued following their joint withdrawal from the securities business and NASD supervision, either could compel the other to surrender the right to court adjudication in favor of FINRA

arbitration of any dispute relating to their future "business activities." That interpretation would be incompatible with the reasonable expectations of the parties to the arbitration agreement, and could not reasonably be inferred from their long prior acceptance of submission to the FINRA or NASD Code. Nor would it make any sense from the point of view of FINRA. FINRA would have no reason to arbitrate a dispute relating to business activities that had nothing to do with FINRA's regulatory interests merely because once, in the distant past, the disputants had briefly been under FINRA's supervision. As the district court put it, "it simply cannot be the case that any FINRA member would have contemplated that its FINRA membership would perpetually subject it to FINRA's arbitration requirement, even for causes of action arising long after its membership ended." App. 194 (quoting *Metro. Life Ins. Co. v. Puzzo*, 1:13-cv-3858, 2014 WL 1817636, at *2 (N. D. Ga. May 6, 2014) (internal quotation marks omitted)).

Other courts, encountering the argument here advanced by Bucsek, have sensibly rejected it. These courts have uniformly concluded that the Code's continuation of "member[ship]" following termination or cancellation means, as MetLife advocates, that if the material events that gave rise to a

dispute occurred while a party was a functioning member, that party is bound by the Code for the purposes of that dispute, even if it has subsequently canceled its membership or been expelled. *See Christensen v. Nauman*, 73 F. Supp. 3d 405, 411 n.4 (S.D.N.Y. 2014) (concluding that a party whose FINRA membership terminated prior to the litigation was not precluded from pursuing FINRA arbitration, so long as it was still a member at the time of the "material events giving rise to the dispute" (quoting *Puzzo*, 2014 WL 1817636, at *3)).  We conclude that neither the NASD nor the FINRA Code can be reasonably interpreted as providing for arbitration of Bucsek's claims over events that occurred years after both he and MetLife had terminated their relationship with the NASD.

We conclude that, insofar as demonstrated on the motion for preliminary injunction, if the arbitrability of this dispute is to be determined by the court, it is not arbitrable. We recognize that the non-arbitrability of the dispute does not determine whether the question of arbitrability is for the court or for arbitrators, as parties may consent to submit arbitrability to arbitrators even for disputes which clearly do not fall within the scope of their

agreement to arbitrate. We therefore turn to Bucsek's argument that the arbitration code provides for arbitration of the question of arbitrability.

2. *FINRA Code Rule 13413 and* Alliance Bernstein. Bucsek argues that notwithstanding our conclusion that the dispute is not arbitrable, the FINRA Code calls for arbitration of arbitrability. He cites FINRA Rule 13413, which provides that the arbitration panel "has the authority to interpret and determine the applicability of all provisions of the Code." He further points out that in *Alliance Bernstein Investment Research and Management, Inc. v. Schaffran*, 445 F.3d 121 (2d Cir. 2006), we concluded that NASD Rule 10324, which is substantially identical to FINRA 13413, evidenced a clear and unmistakable intention in an arbitration agreement that incorporated the NASD Code to have the arbitrators decide arbitrability of a question that turned on interpretation of the Code. Bucsek contends that the *Alliance Bernstein* ruling compels us to rule that the Code clearly and unmistakably delegates the resolution of arbitrability to the arbitrators here.  We are not persuaded. The claim in *Alliance Bernstein* was so different from Bucsek's claims that the holding in that case cannot reasonably govern this one.

In *Alliance Bernstein*, an NASD member's employee (an associated person) sought to arbitrate his claim of wrongful termination. Unlike Bucsek's claim, the claim in *Alliance Bernstein* related entirely to events that occurred while the employer was an NASD member operating in the securities business and while the claimant was an "associated person," so that the dispute was indisputably subject to the provisions of the NASD Code. The employee claimed he had been terminated by reason of his cooperation in government investigations into the operations of the employer, and that his termination therefore violated § 806(a) of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A (prohibiting an employer from discharging an employee "because of any lawful act done by the employee . . . to provide information . . . or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of [federal securities laws]"). *See Alliance Bernstein*, 445 F.3d at 123. Under the pertinent provisions of the NASD Code, disputes between a member and an associated person were arbitrable unless they fell within the terms of an explicit exception for claims of "employment discrimination." *Id.* at 124. Accordingly, the question whether the parties had agreed to arbitrate turned on whether the employee's

claim that he had been discharged in retaliation for his cooperation with the government was a claim of "employment discrimination." If not, the claim was arbitrable. The NASD Code's Rule 10324, like FINRA Rule 13413, gave arbitrators authority "to interpret and determine the applicability of all provisions under [the] Code." *Id*. (quoting NASD Code Rule 10324).

We concluded that, in "empower[ing the arbitrators] to interpret and determine the applicability of all provisions under this Code," *id*. at 124, the parties had delegated to the arbitrators, and not the court, the determination of the arbitrability of that dispute.

Given the fact that neither in our case nor in *Alliance Bernstein* does the arbitration agreement contain language directly addressing the question who should decide the arbitrability of the dispute, the courts are required in both cases to examine other provisions of the agreement to interpret the contractual intent of the parties on that issue. In *Alliance Bernstein*, it was beyond dispute that the controversy was generally covered by the NASD Code and a high likelihood furthermore that it was arbitrable. Because the dispute was based on business activities of a member in relation to an associated person while both were subject to NASD supervision, it was

indisputably within the general scope of the arbitration Code. In addition, the asserted violation of law, the termination of an employee by reason of actions of the employee that are harmful to the interests of the employer, is sufficiently different from the conventional understanding of "discrimination," as to give strong support to arbitrability under the Code provisions. The rule empowering the arbitrators to interpret the Code therefore supported the conclusion that the agreement intended to give the arbitrators authority over the question of arbitrability, and there was nothing in the agreement to support a contrary interpretation.

Here, in contrast, the agreement cannot be reasonably interpreted to provide for arbitration of the dispute. While that fact does not preclude construing an agreement as providing for arbitration of arbitrability, it is a substantial makeweight against such a conclusion unless counterbalanced by clear language contradicting the logical inference that parties who clearly agree not to arbitrate a particular type of dispute are unlikely to intend to arbitrate the arbitrability of such a dispute. The language of NASD Rule 10324, which was sufficient to support the inference of intent to arbitrate arbitrability in circumstances of a dispute between a current NASD member

and associated person where there was no evidence pushing in the opposite direction, is not necessarily sufficient to support a clear and unmistakable inference of intent to arbitrate arbitrability when other aspects of the agreement argue powerfully against that inference. We think it extraordinarily unlikely that the *Alliance Bernstein* panel could have reached the same result if its claimant, like Bucsek, had been seeking arbitration of a dispute based on facts that occurred years after he and his employer had ceased to operate under the regulatory authority of the NASD. The *Alliance Bernstein* panel cannot have anticipated that its altogether reasonable holding in those circumstances would be applied to a far-fetched claim of arbitrability of a dispute based on facts that arose long after the parties had withdrawn from NASD supervision. Rule 13413's support for an inference of contractual intent to confer arbitrability on the arbitrators is only moderate. The provision empowering arbitrators "to interpret and determine the applicability of all provisions of the Code" makes clear that arbitrators do not lack authority to interpret the Code and determine the applicability of its provisions, but it does not suggest that this power belongs exclusively to arbitrators. In the context of a claim based on events that occurred years after both parties to the

23

dispute had severed all connections with the NASD, this provision fails to support a clear and unmistakable inference that the contract intended to confer the resolution of arbitrability on the arbitrator.

3. *Henry Schein*. Bucsek further argues that our reasoning is not compatible with the Supreme Court's holding in *Henry Schein*. He essentially construes *Henry Schein* to mean that a court considering whether the arbitration agreement confers authority over arbitrability on the arbitrators may not consider whether the agreement calls for arbitration of the dispute. That argument misunderstands the point of *Henry Schein*. Its meaning is quite different. The point of the *Henry Schein* opinion was that, where the parties *have agreed* to submit arbitrability to arbitration, courts may not nullify that agreement on the basis that the claim of arbitrability is groundless. The fault found by the Supreme Court in the lower court opinions was not that they failed to send the question of arbitrability to arbitrators. It was that the lower court, applying what the Supreme Court called a "wholly groundless exception," failed to make a finding on whether the arbitration agreement called for sending arbitrability to the arbitrator. The fact that a claim of arbitrability is groundless does not necessarily mean that the parties did not

intend to have the question of arbitrability determined by arbitrators. The parties might nonetheless have agreed to submit arbitrability to arbitrators, and the court should not conclude otherwise without having explored the intentions of the contract on that question. Nonetheless, courts were warned not to "assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Id*. at 531 (quoting *First Options,* 514 U. S. at 944). The proposition that there is no valid "wholly groundless exception" to enforcing an arbitration agreement that gives the arbitrators authority over the question of arbitrability does not suggest that, in interpreting the agreement to discern whether it intended to confer the resolution of arbitrability on the arbitrators, the court should not consider all pertinent evidence. We reject Bucsek's claim for arbitration of arbitrability not because we view the claim of arbitrability is groundless. We reject it because, upon consideration of all evidence of the intentions of the arbitration agreement, including the groundlessness of Bucsek's claim of arbitrability, the agreement does not clearly and unambiguously provide for arbitration of the question of arbitrability. Our reasoning is based on the parties' contract, and not based on any exception to what the parties have contracted for.

In conclusion, so far as shown in the district court record, the arbitration code does not apply to a dispute based on events that occurred years after the parties had severed their connections with the NASD. Furthermore, we find nothing in the Code that clearly and unmistakably evidences a contractual intent to confer resolution of arbitrability on the arbitrators for a claim such as Bucsek's, which is based on facts long subsequent to the parties' involvement in the NASD. Finding no error, we affirm.[4]

---

[4] As the district court's ruling was made on a motion for a preliminary injunction, we recognize that Bucsek retains the right to present additional evidence supporting his arguments at a trial of Metlife's demand for a permanent injunction.